No. 2488.

## Giles Wimbish v. The State.

1. **Practice in the Court of Appeals—Exception—Continuance.—** The refusal of the trial court to award a continuance will not be revised by this court unless the same be presented by bill of exceptions.
2. **Same—Charge of the Court.—** Errors in the charge of the court, unless they are presented by proper bill of exceptions, will not be revised by this court except they be fundamental in character, or such as, under all the circumstances of the case, were calculated to injure the rights of the accused.

Appeal from the District Court of DeWitt. Tried below before the Hon. H. C. Pleasants.

This conviction was had upon an indictment which charged the appellant with the theft of one head of cattle, the property of Thomas Rucker, in DeWitt county, Texas, on the sixteenth day

of October, 1886.  The penalty assessed by the verdict was a term of two years in the penitentiary.

Henry Keller was the first witness for the State.  He testified that he was a merchant, and conducted a mercantile establishment in the town of Cuero.  On the sixteenth day of October, 1886, the defendant came into witness's store and executed a bill of sale conveying a certain cow to William Curlin, the brother-in-law of the witness.  Curlin was a foreigner and could not speak nor understand English well, and the witness ordinarily transacted business for him.  Defendant made a copy of the cow's brand on a piece of paper, to guide witness and witness drew up the bill of sale.  The brand made by defendant was HL connected.  Witness asked him if he owned that brand.  He replied that he did.  He then signed the bill of sale as the maker of the same, and the witness signed it as attesting witness.  The witness identified the bill of sale which, at this stage of the case, was put in evidence.  It reads as follows:

"STATE OF TEXAS, ⎰  Know all men by these presents that I, COUNTY OT DEWITT. ⎱ Giles Wimbish, of said State and county of DeWitt, in consideration of the sum of nine dollars and fifty cents, to me paid by William Curlin, the receipt of which is hereby acknowledged, have bargained, sold, and by these presents do bargain and sell unto William Curlin, the following described ——; hereby binding myself to warrant and defend the title to said——, against any person claiming or to claim the same, or either of them.

| No. | Age. | Sex. | Mark. | Brand. |
|-----|------|------|-------|--------|
| one. |     | cow. |       | HL (connected.) |

"Witness my hand this sixteenth day of October, 1886."
                              (Signed)            "GILES WIMBISH."
"Attest: H. KELLER."

William Curlin testified, for the State, that on or about October 16, 1886, he bought a cow from the defendant, paying the defendant through Keller, to whom he sent the defendant for the purpose of executing the bill of sale—a matter about which witness knew nothing.  Three dollars and a half of the purchase money was a debt to that amount due witness by the defendant for meat.  Witness supposed that the bill of sale certified something, and therefore did not examine the brand and did not know

what it was. The cow was delivered to witness in his pen by defendant and by Jim Samuels who, by direction of the witness, went with the defendant to drive the cow to witness's pen. Keller told witness that the cow was inspected by Jake Ryan, the cattle and hide inspector. The cow bought by witness from defendant on the said October 16, was a red and white speckled cow, and was the only animal of the cattle kind ever bought by witness from defendant.

Jim Samuels testified, for the State, that in October, 1886, he was in the employ of William Curlin, his employment being about the butcher and cattle pens. Witness went from the pens towards the Ed. Williams place on the morning of October 16, 1886, and met the defendant driving a white and red speckled cow towards the pen. Defendant told witness that Curlin told him to get witness to help drive the cow to the pen. After some general talk the witness went back to the pen with defendant, driving the cow. Witness afterwards killed the cow by direction of Curlin.. He did not know the brand of that cow, but knew it was the only cow ever obtained by Curlin from defendant during the time witness was in Curlin's service. Curlin did not tell witness to help defendant drive the cow to the pen, but defendant told him that Curlin directed him to tell witness to help drive the cow. Witness rode one of Curlin's horses which he kept to use in Curlin's service, but Curlin did not on that day give witness a horse for the particular purpose of helping defendant drive the cow. Defendant told witness that he bought the cow, but did not say from whom. Defendant went to town after the cow was penned, and witness went home. He afterwards went to Jake Ryan's house to get Ryan to inspect the cow. He was never at an inspection of the cow by Ryan and could not say that there ever was an inspection of her. Aus. Lewis of Cuero came to the pen on the day after the cow was put in the pen, and while she was still in the pen, said that the said cow was stolen property, and wanted to know who put her in the pen. Curlin had other cattle when he purchased this cow. The purchase was made on Thursday, and the cow was killed on the Sunday following. She was not kept in the pen all of the intervening time. Witness lived at Clinton Bend. He had no recollection of ever seeing the cow before he helped to pen her. At the time that the cow was penned witness said to defendant: "You had better let that cow alone; she might get you into trouble." Defendant replied: "I traded for her and have a bill

of sale; she is good property." Witness did not see Curlin buy the cow from the defendant.

N. J. Ryan, deputy cattle and hide inspector, testified, for the State, that some time between the second and twentieth days of October, 1886, his wife told him that during his absence from home a man had called at his house to get him to inspect a cow for Curlin. He then went to Curlin's pen and found in it a white and speckled cow counterbranded WHE and also HL connected, the first stroke of the H having a left hand attachment making it look something like the figure 4—altogether 4HL connected. The said last brand was dim and could not be traced well. Witness did not know who sold the said cow to Curlin. The cow described was the only cow in the brand described ever inspected by witness for Curlin. Witness went to see Curlin before he went to the pen, and Curlin told him to go to the pen and inspect the said cow. No one was with witness at the time of the inspection.

Aus. Lewis testified, for the State, in substance, that he was at Curlin's butcher pen on or about October 17, 1886, and saw the cow mentioned in the indictment in one of the pens. That was a white and red specled cow, counter branded WHE and branded HL connected. Witness, who was in the employ of Mr. Friars, had before seen that cow in the flat between Cuero and the river, and at Clinton Bend. He, however, did not know who owned her, and regarded her as an estray. Williams never sold nor tried to sell that cow to defendant, nor to any one else. He had a conversation with Eph. Williams, in the course of which he asked Eph. who gave the HL connected brand. Williams said he did not know. Witness never had any other conversation with Eph. Williams about the cow. While witness was at Curlin's butcher pen he asked who penned the cow, but did not say, in the presence of Jim Samuels, that the cow was stolen property. The brand on the cow was the brand of Mr. Rucker. Witness denied that he ever said that Ryan inspected the cow under the wrong brand. At this stage of his examination the witness was shown a bill of sale which reads as follows:

"CUERO, TEXAS, County of DeWitt.

"October 13, 1886, this is to certify that i have this day bargain sold and delivered to Jiles Wimbbush one read and white speckle cow branded on the left ribs WHE (HE connected) WHE (HE connected) HL" (connected)    Aus louis."

Witness declared that he never executed or signed or authorized the execution or signature of the said bill of sale. He never saw it until he saw it in the court room. He always signed his name "Austin Lewis." He did not know who stole the cow, nor that she was stolen. He never told the defendant, nor did he ever send word to the defendant, that either he, the defendant, or he, the witness, would have to leave the country.

Norah Mills testified, for the State, that, sometime in the spring of 1887—she could not be positive as to the time—after the defendant had been indicted for the theft of a cow, but whether in this or some other case the witness did not know, the defendant came to the house of witness's husband, and proceeded, with the help of witness's husband, to write a paper. Witness did not know the contents nor nature of that paper, but after it was written the defendant asked her and her husband if they would swear, should it become necessary, that they saw the defendant buy a cow from Aus. Lewis. That paper was torn up, and defendant left witness's house. This all occurred at night.

Thomas Rucker testified, for the State, that, in the spring of 1885, he missed four of his cows from their range near Clinton Bend, in DeWitt county. One of the cows was a red and white speckled animal, branded and counterbranded WHE, and branded 4HL (connected) on the left ribs. This last mentioned cow was never recovered by the witness. If taken by any one, she was taken without the witness's knowledge or consent.

The State closed.

Eph. Williams testified, for the defense, that prior to the defendant's first trial in December, 1886, Aus. Lewis asked him who gave the HL connected brand. Witness replied that he did not know. Aus Lewis then said: " If I did sell Giles Wimbish a cow, he had no business to take that cow."

Harriet Brown, the mother-in-law of the defendant, testified in his behalf, that in October, 1886, she lived with defendant and his wife, occupying a room next to that occupied by defendant and his wife. Aus. Lewis came to defendant's house one night during the said month of October. He talked to defendant in the yard for a while, and then went into defendant's room, and was in that room when witness went to bed and to sleep. She did not know what passed between defendant and Aus. Lewis on that night.

Defendant's wife testified, in his behalf, that on a Wednesday night, in October, 1886, Aus. Lewis came to the house of wit-

ness's mother, where she and defendant were then living, and in witness's presence sold defendant a white and red speckled cow. He, Aus. Lewis, wrote the bill of sale with a lead pencil on paper furnished him by the witness, and that bill of sale was the identical one exhibited to and repudiated on the stand by the witness Lewis. Witness could not read, but was able to identify the paper as that which she gave Lewis when he wrote the bill of sale. Defendant on that night paid Lewis three dollars of the seven dollars and a half that he was to pay for the cow. Defendant could neither read nor write, but witness thought he could sign his name. Defendant got up and drove off the cow on the next morning.

Abe Cartright testified, for the defense, that about a week before the meeting of the grand jury which presented this bill of indictment, the State's witness Aus. Lewis came to him, in front of Runge's store in the town of Cuero, and asked him to tell defendant that he, Lewis, wanted to see him; that Ryan had inspected the cow in the wrong brand; that Ryan inspected her as a 4HL connected cow, whereas she was an HL connected cow: that either he, Lewis, or defendant would have to leave the country; that the defendant had better leave, and that, when the grand jury met, he, Lewis, would know nothing about the case, and would prevent the finding of an indictment. Witness delivered Lewis's message to defendant, and defendant replied that he would not leave the country, as he had a bill of sale for the cow. Witness also told Ryan that Lewis claimed that he, Ryan, had inspected the cow under the wrong brand. Ryan replied that Lewis was mistaken. Witness had never seen the defendant sign his name.

Bill Mills testified, for the defense, that he knew nearly all of the cattle in the Clinton Bend range in DeWitt county. A bunch of four head of cattle branded 4HL and counter branded WHE ran in that range for about two years. One of them, a red cow, died on that range. Two of them disappeared from the range, and the other, a red and white speckled cow, stayed on the range until the fall of 1886, since when witness had not seen her. Defendant often visited witness's house, but witness and defendant never did jointly write a bill of sale to cover any cow. Witness could not write, and had never seen defendant write. Defendant visited witness's house once since his indictment in this case, and he and witness talked about the cow which Aus. Lewis sold to the defendant. George Thompson testified, for the de-

'fense, substantially as did Bill Mills, about the four head of cat-tle being on the Clinton bend range during the time mentioned by Mills.

*W. J. Baker*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

White, Presiding Judge. This appeal is from a judgment of conviction for the theft of one head of cattle.

1. Without a bill of exceptions is saved to the overruling of an application for continuance, the ruling will not be considered on appeal. 2. Unless the charge of the court is excepted to, errors not fundamental nor calculated to injure the rights of the defendant will not necessitate a reversal of the case on appeal.

There are no bills of exception in this record, and we find no reversible error in the charge of the court; on the contrary, we find it a full and liberal exposition of the law applicable to the facts.

Complaint is made that defendant was not allowed the attachments he was entitled to and demanded for his absent witnesses. This complaint is not borne out by the record before us. We have been unable to find any thing in the record for which the judgment should be reversed, and it is therefore affirmed.

*Affirmed.*